**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
)
KENNETH J. DILLON,                          )
)
       Plaintiff,                                )
)
   v.                                             )     Civil Action No. 1:13-cv-532 (RBW)
)
DEPARTMENT OF JUSTICE,            )
)
       Defendant.                             )
_____)

**MEMORANDUM OPINION**

Kenneth J. Dillon, the plaintiff in this civil matter, alleges that the defendant, the Federal

Bureau of Investigation ("FBI"), violated the Freedom of Information Act ("FOIA"), 5 U.S.C. §

552 (2012), by failing to respond adequately to two FOIA document requests submitted by the

plaintiff.  First Amended Complaint ("Am. Compl.")  ¶¶ 14-15, 21-22.  In his first FOIA request,

the plaintiff requested from the defendant "certain records about the August 2001 detention and

arrest of Zacarias Moussaoui[1] and the detention of Abderraouf Jdey[2]."  Id. ¶ 7.  The plaintiff

represents that he subsequently limited this request to only "records documenting the items

found in the possession of Zacarias Moussaoui on 16-17 August 2001" and "records pertaining

to the August 2001 detention which reference cropdusting, cropdusters, or biological or chemical

---

[1] Zacarias Moussaoui is serving a life sentence "after pleading guilty to six counts of conspiracy to commit acts of terrorism and conspiracy to use weapons of mass destruction in connection with the September 11, 2011 terrorist attacks."  Second Declaration of David M. Hardy ¶ 22.

[2] "Abderraouf Jdey has been on the FBI's 'Seeking Terror Information' List since 2005" and "is suspected of plotting terrorist attacks against the United States."  Second Declaration of David M. Hardy ¶ 23; Third Declaration of David M. Hardy ¶ 22.  According to the FBI, "[h]e travelled to Afghanistan in 1999 where he received combat training from the Taliban government . . . [and] has direct ties with known and suspected terrorists, who are also the subject of various pending FBI investigations and prosecutions."  Third Declaration of David M. Hardy ¶ 22.  He "is wanted for questioning in connection with terrorist threats made against the United States."  Second Declaration of David M. Hardy ¶ 23.

terrorism." Id. ¶ 13.  The plaintiff also submitted a second FOIA request for the "FBI's entire file on al Qaeda operative Abderraouf Jdey." Id. ¶ 17.  The defendant moves for summary judgment, Defendant's Motion for Summary Judgment ("Def.'s Mot.") at 1, asserting that "[t]he FBI released certain information in response to both requests . . . but also withheld other information as exempt from disclosure by the statute," Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem.") at 1.  After carefully considering the First Amended Complaint, the Defendant's Motion for Summary Judgment, and the memoranda of law submitted in support of and opposition to the motion, the Court concludes for the reasons that follow that it must grant the defendant's motion.[3]

## I. BACKGROUND

### A.    FOIA Request No. 1170856

The plaintiff alleges that he submitted his first FOIA request to the FBI on July 17, 2011, requesting certain "records about the August 2001 detention and arrest of Zacarias Moussaoui and the detention of Abderraouf Jdey."  Am. Compl. ¶ 7; see also Hardy Decl. 1 ¶ 5; Hardy Decl. 2 ¶ 6.  The FBI asserts that on January 11, 2012, it

> advised [the] plaintiff that the requested records concern a third party and such information cannot be searched for or released absent express authorization and consent by the third party through the execution of a privacy waiver, proof of [the] subject's death, or a clear demonstration that the public interest in disclosure outweighs the personal privacy interests of the third party, and significant public benefit would result from the disclosure of these records.

---

[3] In reaching its decision, the Court considered the following submissions:  (1) the First Amended Complaint ("Am. Compl."); (2) the Defendant's Motion for Summary Judgment ("Def.'s Mot."); (3) the Defendant's Statement of Material Facts Not in Genuine Dispute ("Def.'s Facts"); (4) the Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem."); (5) the First Declaration of David M. Hardy ("Hardy Decl. 1"); (6) the Second Declaration of David M. Hardy ("Hardy Decl. 2"); (7) the Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n"); (8) the Defendant's Memorandum of Points and Authorities in Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Def.'s Reply"); and (9) the Third Declaration of David M. Hardy ("Hardy Decl. 3").

Hardy Decl. 2 ¶ 8; see also Def.'s Facts ¶ 2.  In this letter, the FBI noted that even "[a]bsent the foregoing, . . . the records requested were exempt from disclosure pursuant to FOIA Exemptions 6 and 7(C), with the exception of public records which the FBI would search for upon request."[4] Def.'s Facts ¶ 2; see also Hardy Decl. 2 ¶ 8.  On February 10, 2012, the plaintiff lodged a FOIA appeal with the United States Department of Justice's Office of Information and Privacy ("OIP").  Am. Compl. ¶ 9; Def.'s Facts ¶ 3.  Following its review, the "OIP remanded the request instructing the FBI to conduct a search for responsive records."  Hardy Decl. 2 ¶ 11; see also Am. Compl. ¶ 10.

The FBI conducted a search for records regarding Moussaoui's August 16, 2001, detention and arrest, and "released to [the] plaintiff all non-exempt material totaling [ninety-one] pages," seven which "were released in full," fifty-seven which "were released in part," and twenty-seven which "were withheld in full because they [were] duplicates to other pages released to the plaintiff."  Hardy Decl. 2 ¶ 12; see also Def.'s Facts ¶ 5.  The FBI also conducted a search for records pertaining to Abderraouf Jdey's detention, and "informed [the] plaintiff that [the responsive] material . . . is exempt from disclosure pursuant to 5 U.S.C. § 552(b)(7)(A)," because "Jdey is the subject of a pending law enforcement file and the release of any records could reasonably be expected to interfere with enforcement proceedings."  Hardy Decl. 2 ¶ 13; see also Def.'s Facts ¶ 6; Am. Compl. ¶ 11.  The FBI asserts in its declaration that, with respect to the responsive records for both Moussaoui and Jdey, "[a]ll exempt information has been withheld pursuant to FOIA Exemptions 1, 3, 6, 7(C), 7(A), 7(D), and 7(E) [and] all reasonably segregable, non-exempt information has been released."  Hardy Decl. 2 ¶ 200.

---

[4] The FBI stated that it did not receive a request from the plaintiff to search for public source material, and thus, the FBI assumed that they were not requested.  Def.'s Facts ¶ 2, n.2; Hardy Decl. 2 ¶ 8, n.1.

**B.      FOIA Request No. 1187039**

On March 30, 2012, the plaintiff submitted a second FOIA request to the FBI seeking the

"FBI's entire file on al Qaeda operative Abderraouf Jdey."  Am. Compl. ¶ 17; Def.'s Facts ¶ 7.

On April 3, 2012, the FBI informed the plaintiff that:

> the requested records concern a third party and such information cannot be searched
> for or released absent express authorization and consent by the third party through
> the execution of a privacy waiver, proof of [the] subject's death, or a clear
> demonstration that the public interest in disclosure outweighs the personal privacy
> of the third party, and significant public benefit would result from the disclosure of
> these records.

Hardy Decl. 2 ¶ 16; see also Def.'s Facts ¶ 8.  In its response, the FBI explained that, "[a]bsent

the foregoing, . . . the records requested were exempt from disclosure pursuant to FOIA

Exemptions 6 and 7(C), with the exception of public records which the FBI would search for

upon request."  Def.'s Facts ¶ 8; see also Hardy Decl. 2 ¶ 16. (footnote omitted).

The plaintiff appealed this response to the OIP on April 10, 2012.  Def.'s Facts ¶ 9;

Hardy Decl. 2 ¶ 17, Exhibit ("Ex.") K at 1.  On September 26, 2012, the "OIP affirmed the FBI's

actions, on partly modified grounds stating that 'because any record responsive to your request

would be categorically exempt from disclosure, the FBI properly asserted Exemption 7(C) and

was not required to conduct a search for the requested records.'"  Hardy Decl. 2 ¶ 19; Def.'s

Facts ¶ 10.

Following the plaintiff's commencement of this civil action, the FBI conducted a search

of its records, Hardy Decl. 2 ¶ 33, and "released to [the] plaintiff all public source material on

Abderraouf Jdey."  Id. ¶ 21; Def.'s Facts ¶ 11.  "The releases consisted of [twelve] pages,"

eleven which "were released in full," and one which "was released in part."  Hardy Decl. 2 ¶ 21;

see also Def.'s Facts ¶ 11.  The FBI asserts in its declaration that all other responsive information

"is exempt from disclosure pursuant to Exemption 7(A) since disclosure of the information could

reasonably be expected to interfere with ongoing investigations as well as pending and prospective prosecutions."  Hardy Decl. 2 ¶ 201.  Furthermore, the FBI asserts that the "records pertaining to Jdey are [also] exempt from disclosure under one or more FOIA exemptions, including Exemptions 1, 3, 5, 6, 7(C), 7(D), 7(E), and 7(F)."  Id.  According to the FBI, "[a]ll reasonably segregable non-exempt information has been released to [the] plaintiff."  Def.'s Facts ¶ 25; see also Hardy Decl. 2 ¶ 201.

## II. STANDARD OF REVIEW

Courts will grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Fowlkes v. Bureau of Alcohol, Tobacco, Firearms & Explosives, __ F. Supp. 3d __, __, 2014 WL 4536909, at *3 (D.D.C. 2014).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), and may do so by "citing to particular parts of materials in the record, including . . . affidavits or declarations," Fed. R. Civ. P. 56(c)(1)(A).  "[A] dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on an element of the nonmoving party's claim.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Factual assertions in the moving party's affidavits or declarations may be accepted as true unless the opposing party submits affidavits, declarations, or documentary evidence to the contrary.  Neal v. Kelly, 963 F.2d 453, 456 (D.C. Cir. 1992).  In opposing a summary judgment motion, a party may not "replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit," Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990), but rather must "set forth specific facts showing that there is a genuine issue for trial," Liberty Lobby, 477 U.S. at 248 (internal quotations omitted).

Courts review an agency's response to a FOIA request <u>de novo</u>, 5 U.S.C. § 552(a)(4)(B) (2012), and "FOIA cases typically and appropriately are decided on motions for summary judgment," <u>ViroPharma Inc. v. HHS</u>, 839 F. Supp. 2d 184, 189 (D.D.C. 2012) (citations omitted).  In a FOIA action to compel production of agency records, the agency "is entitled to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced . . . or is wholly exempt from the [FOIA's] inspection requirements.'"  <u>Students Against Genocide v. U.S. Dep't of State</u>, 257 F.3d 828, 833 (D.C. Cir. 2001) (quoting <u>Goland v. CIA</u>, 607 F.2d 339, 352 (D.C. Cir. 1978)).

Summary judgment in a FOIA case may be based solely on information provided in an agency's supporting affidavits or declarations if they are "relatively detailed and nonconclusory," <u>Safecard Servs., Inc. v. SEC</u>, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotations and citations omitted), and when they "[d]escribe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record [or] by evidence of agency bad faith," <u>Military Audit Project v. Casey</u>, 656 F.2d 724, 738 (D.C. Cir. 1981).  "To successfully challenge an agency's showing that it complied with the FOIA, the plaintiff must come forward with 'specific facts' demonstrating that there is a genuine issue with respect to whether the agency has improperly withheld extant agency records."  <u>Span v. U.S. Dep't of Justice</u>, 696 F. Supp. 2d 113, 119 (D.D.C. 2010) (quoting <u>U.S. Dep't of Justice v. Tax Analysts</u>, 492 U.S. 136, 142 (1989)).

### III. ANALYSIS

To prevail on its motion for summary judgment, the defendant "must show beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant

documents," <u>Morley v. CIA</u>, 508 F.3d 1108, 1114 (D.C. Cir. 2007), and that information

identified as responsive "has been produced . . . or is wholly exempt from" disclosure, <u>Students</u>

<u>Against Genocide</u>, 257 F.3d at 833.  For the reasons that follow, the Court finds that: (1) the

defendant conducted reasonable and adequate searches, where necessary; (2) the defendant

withheld from disclosure only information for which a FOIA exemption properly applies; and (3)

the defendant released all reasonably segregable information not otherwise exempt from

disclosure.

### A.      Adequacy of the Defendant's Searches

The adequacy of an agency's search is measured by a standard of reasonableness under

the attendant circumstances.  <u>Truitt v. U.S. Dep't of State</u>, 897 F.2d 540, 542 (D.C. Cir. 1990).

To satisfy its burden to show that no genuine issue of material fact exists, the defendant must

show that each agency component "has conducted a search reasonably calculated to uncover all

relevant documents," <u>Elliott v. U.S. Dep't of Agric.</u>, 596 F.3d 842, 851 (D.C. Cir. 2010) (quoting

<u>Weisberg v. U.S. Dep't of Justice</u>, 705 F.2d 1344, 1351 (D.C. Cir. 1983)), and it may base its

showing on affidavits or declarations submitted in good faith, <u>see</u> <u>Truitt</u>, 897 F.2d at 542,

provided that these affidavits or declarations explain in reasonable detail the scope and method

of the search, <u>see</u> <u>Morley</u>, 508 F.3d at 1116 (citing <u>Goland</u>, 607 F.2d at 352).  "In the absence of

contrary evidence, such affidavits or declarations are sufficient to demonstrate an agency's

compliance with [the] FOIA."  <u>North v. U.S. Dep't of Justice</u>, 774 F. Supp. 2d 217, 222 (D.D.C.

2011) (citing <u>Perry v. Block</u>, 684 F.2d 121, 127 (D.C. Cir. 1982)).  There is no requirement that

an agency search every record system in response to a FOIA request; rather, it may limit its

search to only those locations where responsive documents likely are maintained.  <u>Porter v. CIA</u>,

778 F. Supp. 2d 60, 69-70 (D.D.C. 2011).  However, if the record "leaves substantial doubt as to

the sufficiency of the search, summary judgment for the agency is not proper." Beltranena v. Clinton, 770 F. Supp. 2d 175, 183 (D.D.C. 2011) (quoting Truitt, 897 F.2d at 542); see also Valencia–Lucena v. U.S. Coast Guard, 180 F.3d 321, 326 (D.C. Cir. 1999) (stating that summary judgment is inappropriate "if a review of the record raises substantial doubt" about the adequacy of the search (citation omitted)).

In response to the plaintiff's first FOIA request, the FBI "conducted an automated search of [its Central Records System] on August 29, 2012[,] for records on Zacarias Moussaoui." Hardy Decl. 2 ¶ 31; see also Hardy Decl. 3 ¶¶ 7-8. As the FBI explains in its declaration,

> [t]he Central Records System ("CRS") enables the FBI to maintain information which it has acquired in the course of fulfilling its mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files, called FBI "classifications," which are broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter (or program). Certain records are maintained at FBI [Headquarters]. Records that are pertinent to specific field offices of the FBI are maintained in those field offices.

Hardy Decl. 2 ¶ 24. Entries in the CRS:

> fall into two categories: (a) A 'main' entry, or 'main' file, carries the name corresponding with a subject of a file contained in the CRS[; and] (b) A 'reference' entry, or a 'cross reference,' is generally only a mere mention or reference to an individual, organization, or other subject matter, contained in a document located in another 'main' file on a difference subject matter.

Id. ¶ 25. The Automated Case Support System, "an internal computerized subsystem of the CRS," Id. ¶ 27, "consists of three integrated, yet separately functional, automated applications that support case management functions for all FBI investigative and administrative cases," id. ¶ 28. These applications include: (1) Investigative Case Management, which "provides the ability to open, assign, and close investigative and administrative cases as well as set, assign and track leads"; (2) Electronic Case File, which "serves as the central electronic repository for the FBI's

official text-based documents"; and (3) Universal Index, which "provid[es] a complete subject/case index to all investigative and administrative cases."  Id.

In conducting its search, "[t]he FBI utilized a name breakdown to locate all potentially responsive records . . . [, which] included . . . variations" of Moussaoui's name.  Hardy Decl. 2 ¶ 31; see also Hardy Decl. 3 ¶ 10.  "The FBI first searched the CRS using the subject's name and arrest date provided by [the] plaintiff."  Hardy Decl. 3 ¶ 10.  Following the OIP's May 11, 2012 remand, the FBI conducted a second search of the CRS, using the same search terms.  Hardy Decl. 2 ¶ 31.  In addition, the FBI "conducted a text search in [the] CRS" for files containing the terms "Moussaoui" and "Pesticide," "Chemical Terrorism," "Biological Terrorism," "Cropdusting," or "Cropdusters."  Id. (footnote omitted).  As the FBI explains, "using 'AND' between two search terms will identify records in which both terms appear within the document."  Id.  After conducting this search, "[t]he FBI was unable to locate records responsive to [the] plaintiff's request."  Id.

In addition to its search of the CRS, "the FBI contacted a special agent with first-hand knowledge of the Moussaoui investigation, and requested assistance in locating . . . the full internal FBI report on the 08/16/2001 arrest of Moussaoui; items found in his possession at the time of the arrest including any computer disks; and the report that was sent to the intelligence community regarding his arrest."  Hardy Decl. 2 ¶ 31.  The special agent identified responsive records, some which "were directly provided by the special agent" and some which "were identified by the special agent and later located in the CRS."  Hardy Decl. 2 ¶ 31.  "The FBI processed all records in accordance with the FOIA and released non-exempt material to [the] plaintiff on August 26, 2013."  Id.

With respect to the plaintiff's first FOIA request for records concerning Abderraouf Jdey, the FBI searched the CRS for "[a]ny [other] records related to the August 16, 2001 detention of Abderraouf Jdey." Hardy Decl. 2 ¶ 32. Specifically, "[t]he FBI searched the automated indices of the CRS using the subject's name as well as an alias, 'Jdey, Abderraouf Ben Habib Bin Youssef,'" including variations such as "Abderraouf, Jdey," and "Abderraouf, J." Id. Following the OIP's remand, the FBI conducted another CRS search and "was unable to locate any records pertaining to Jdey's August 16, 2001 arrest." Id. While "[t]he FBI identified other records indexed under Jdey; . . . these records were not responsive to [the] plaintiff's request and related to various pending investigations, and no responsive records were located." Id.

With respect to the plaintiff's second FOIA request for "the entire file on al Qaeda operative Abderraouf Jdey," the FBI conducted a search of the CRS using "the subject's name as well as all aliases identified on the FBI's Seeking Information poster." Id. ¶ 33. The "search of the aliases included: Abd Al-Rauf Bin Al-Habib Bin Yousef Al-Jiddi; Abderraouf Dey; A. Raouf Jdey; Abdal Ra'Of Bin Muhammed Bin Yousef Al-Jadi; Farouq Al-Tunisia; and Abderraouf Ben Habib Jeday." Id. ¶ 33, n.11. "[T]he FBI identified a main file and cross references that were potentially responsive to the plaintiff's request," and "[e]ach record was reviewed individually for responsiveness." Id. ¶ 33.

Based upon the searches described above, the Court finds that the FBI's declarations set forth sufficient factual detail of the methods utilized in conducting a search for responsive documents to conclude that the FBI "has conducted . . . search[es] reasonably calculated to uncover all relevant documents." Elliott, 596 F.3d at 851. Therefore, the Court must find that the FBI's searches were reasonable under the attendant circumstances. See, e.g., Abdeljabbar v. Bureau of Alcohol, Tobacco and Firearms, __ F. Supp. 3d __, __, 2014 WL 6478794, at *7

(D.D.C. 2014) (finding FBI's declaration provided sufficient detail of methods used in searching for responsive documents); <u>Dent v. Exec. Office for U.S. Attorneys</u>, 926 F. Supp. 2d 257, 265-67 (2013) (finding adequate the FBI's search of its Central Records System, in response to the plaintiff's FOIA request).  "Once an agency has made a prima facie showing of adequacy, the burden shifts to the plaintiff to provide . . . evidence sufficient to raise 'substantial doubt' concerning the adequacy of the agency's search."  <u>Schoenman v. FBI</u>, 764 F. Supp. 2d 40, 46 (D.D.C. 2011) (citing <u>Iturralde v. Comptroller of Currency</u>, 315 F.3d 311, 314 (D.C. Cir. 2003)).

The plaintiff presents four challenges to the scope and the outcome of the searches, none which are persuasive.  First, he objects to the "FBI's failure to search email systems for responsive records about Moussaoui not indexed in [the] CRS."  Pl.'s Opp'n at 13.  But "there is no requirement that an agency search every record system in response to a FOIA request, . . . only those [systems of] records that are likely to have responsive documents."  <u>Porter</u>, 778 F. Supp. 2d at 69 (citing <u>Oglesby v. U.S. Dep't of the Army</u>, 920 F.2d 57, 68 (D.C. Cir. 1990)).  And "[a]t summary judgment, a court may rely on [a] reasonably detailed affidavit . . . averring that all files likely to contain responsive materials (if such records exist) were searched."  <u>Ancient Coin Collectors Guild v. U.S. Dep't of State</u>, 641 F.3d 504, 514 (D.C. Cir. 2011) (quotations and citation omitted).  According to the FBI, any "[e]mails that have investigative significance are serialized by agents and placed in the CRS for record-keeping and future retrieval."  Hardy Decl. 3 ¶ 17.  "The records located as a result of the various [CRS] searches provided no indication that any responsive records would reside [only] in email."  <u>Id.</u>  Therefore, the FBI determined that "there is no reasonable basis to conclude that . . . [additional] responsive records would be located" by a search of its email system, and "email searches would be unnecessary and unduly burdensome."  <u>Id.</u>  The plaintiff's "mere speculation that as yet

11

uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search." Hodge v. FBI, 703 F.3d 575, 580 (D.C. Cir. 2013) (internal quotation marks and citation omitted). Thus, the Court concludes that the FBI's decision not to search its email system for responsive records does not defeat the adequacy of its searches. See, e.g., Rosenberg v. U.S. Dep't of Immigration & Customs Enforcement, 13 F. Supp. 3d 92, 103 (D.D.C. 2014) (finding the FBI's search of the CRS adequate because "all files reasonably likely to contain responsive materials were searched").

Second, the plaintiff objects to the "FBI's failure to search the Minneapolis Field Office or other offices for responsive records not indexed in [the] CRS," Pl.'s Opp'n at 13, "such as files stored on shared drives or local computers," id. at 16. But again, an agency's duty under the FOIA is only to "conduct a search reasonably calculated to uncover all relevant documents." Truitt, 897 F.2d at 542. The agency need not search the records of a particular field office if the original request "ma[kes] no reference to [that particular] field office"[5] and there does not exist "an agency record [that] contains a lead so apparent that the [agency] cannot in good faith fail to pursue it." Kowalczyk v. U.S. Dep't of Justice, 73 F.3d 386, 388-390 (D.C. Cir. 1996) ("If . . . the requester clearly states that he wants all agency records on a subject, i.e., regardless of their location, but fails to direct the agency's attention to any particular office other than the one receiving the request, then the agency need pursue only a lead it cannot in good faith ignore, i.e., a lead that is both clear and certain.") Put differently, an agency need only search the records of

---

[5] The plaintiff represents in his opposition that he specifically requested a search of the Minneapolis Field Office files in his clarification letter that he sent to the FBI on July 5, 2013, Pl.'s Opp'n at 4, and this "specific[] and unequivocal[] instruct[ion]" was conveyed before the FBI conducted its search, id. at 15. However, in assessing the adequacy of an agency's search, it is error for a Court to consider leads proposed in a plaintiff's "subsequent clarification" or "appeal letter." See Wiesner v. FBI, 668 F. Supp. 2d 164, 171 (D.D.C. 2009) ("[T]he Court concludes that it erred . . . by considering the additional search terms in determining whether the FBI conducted a reasonable and adequate search.") (citing Kowalczyk, 73 F.3d at 388-89). Indeed, "the Court must focus only on the plaintiff's original request to the [agency], and the [a]gency's efforts to respond to that request, in making its determination." Id.

a particular field office in those "rare" situations where "red flags point[] to the probable

existence of responsive agency records that arise during its efforts to respond to a FOIA request."

Wiesner v. FBI, 668 F. Supp. 2d 164, 170-71 (D.D.C. 2009) (interpreting Kowalczyk, 73 F.3d at

389).  Here, in its effort to locate responsive records the FBI "even contacted the special agent

who worked on the Moussaoui investigation and drafted the reports from the Minneapolis Field

Office."  Hardy Decl. 3 ¶ 17.   Furthermore, the CRS searches afford access to field office files

because "FBI Field Offices have automated indexing functions."  Hardy Decl. 2 ¶ 26.  To the

extent the plaintiff demanded that the FBI search files stored on shared drives or local computers

at the Minneapolis Field Office, the FBI states that is chose not to search these files because

"there is no factual basis to conclude that any responsive records would be located through

searches of shared drives or local computers."  Hardy Decl. 3 ¶ 18.  The FBI explains that these

files are "used as temporary working folders for electronic media where draft documents are

temporarily stored prior to final approval" and "[o]nce final approval is received, the material is

added to . . . the CRS . . . and later deleted from that shared drive or local computer."  Id.  As the

FBI's declarations "exclude the possibility that records potentially responsive to [the]

[p]laintiff's request are reasonably likely to be found in locations outside of the CRS," such as

the local records of the Minneapolis Field Office and its shared drives or local computers, the

Court concludes that the plaintiff's argument is without merit.  See Rosenberg, 13 F. Supp. 3d at

104.

      Third, the plaintiff objects to the "FBI's apparent limitation of the first request [for]

records explicitly mentioning the 16 August 2001 arrest date."  Pl.'s Opp'n at 13.  Even though

his first request included this very limitation, the plaintiff now protests the fact that the results

indicate that the FBI "possesses only one document . . . discussing Moussaoui's possession of the

Cropdusting Manual." Id. at 16.  Based upon these results, the plaintiff concludes that the FBI's

search "smacks of 'read[ing] [a] request so strictly that the requester is denied information the

agency well knows exists in its files, albeit in a different form from that anticipated by the

requester." Id. at 17 (quoting Hemenway v. Hughes, 601 F. Supp. 1002, 1005 (D.D.C. 1985).

The plaintiff's characterization of the law is erroneous.  This Circuit has held consistently that

the adequacy of a search is "determined not by the fruits of the search, but by the appropriateness

of [its] methods."  Iturralde, 315 F.3d at 315 (citation omitted); see also Weisberg, 745 F.2d at

1485 ("[T]he issue to be resolved is not whether there might exist any other documents possibly

responsive to the request, but rather whether the search for those documents was adequate.").  In

Hemenway, the Court noted that the plaintiff's ambiguous request for "the List of Persons

Accredited to attend the Department of State press briefings, their news affiliation and

citizenship" was subject to competing interpretations—"the request reasonably could be

interpreted to ask either for a single list of accredited persons complete with citizenship

information, or . . . for a list of accredited persons and any additional information the agency

might have dealing with citizenship and news affiliation."  Hemenway, 601 F. Supp. at 1005.

The Court concluded that this was a "semantic debate" and that "the defendants had an

obligation to provide any files containing citizenship information that they had."  Id.  Hemenway

is inapposite because no such semantic concerns are apparent here; the FBI imposed a limitation

on the scope of its search based upon a reasonable interpretation of the plaintiff's request.  The

Court, therefore, must conclude that the plaintiff's argument that the "fruits of the search"

indicate an inadequate search is also without merit.  See Iturralde, 315 F.3d at 315.

Lastly, the plaintiff objects to the "FBI's failure to search for and process records about

the Moussaoui indictments."  Pl.'s Opp'n at 13.  But documents pertaining to any Moussaoui

indictment falls outside a reasonable interpretation of the scope of the plaintiff's original request for documents pertaining to Moussaoui's <u>arrest</u> on August 16, 2001.  And an agency's decision to conduct a "targeted search" based on the scope of the plaintiff's request is proper under the FOIA.  See Bloomgarden v. U.S. Dep't of Justice, 10 F. Supp. 3d 146, 153 (D.D.C. 2014) (agreeing with agency's assertion that its "targeted search for personnel documents . . . was reasonable in light of the narrow nature of [the] plaintiff's request that focused on the termination of [a particular Assistant United States Attorney]").  Moreover, as previously stated, the adequacy of a search is "determined not by the fruits of the search, but by the appropriateness of [its] methods."  Iturralde, 315 F.3d at 315 (citation omitted).  Therefore, the Court must conclude that the FBI has submitted affidavits sufficient to establish the adequacy of its searches based upon the "circumstances of the case," and the plaintiff has failed to establish "substantial doubt" as to the sufficiency of the search."  See Truitt, 897 F.2d 540.

### B.  The FOIA Exemptions Asserted by the Defendant[6]

#### 1.  Exemption (b)(1):  Classified Information

Pursuant to Exemption (b)(1), an agency may withhold documents "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).  The Court must "accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record because the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse [effects] might occur as a result of a particular classified

---

[6] To summarize, with regard to FOIA request number 1170856, the FBI withheld portions of records pursuant to FOIA Exemptions (b)(1), (b)(3), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).  Hardy Decl. 2 ¶ 200.  With regard to FOIA request number 1187039, the FBI withheld portions of records pursuant to FOIA Exemptions (b)(1), (b)(3), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), (b)(7)(E) and (b)(7)(F).  Id.

record." Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice, 331 F.3d 918, 927 (D.C. Cir. 2003) (internal quotations and citations omitted) (alteration in original).  Indeed, "the government's burden is a light one," ACLU v. Dep't of Def., 628 F.3d 612, 624 (D.C. Cir. 2011), as "[t]his is necessarily a region for forecasts in which informed judgment as to potential future harm should be respected," Gardels v. CIA, 689 F.2d 1100, 1106 (D.C. Cir. 1982).

The FBI invoked Exemption (b)(1) as the basis for withholding "classified information, including foreign government information . . . ; intelligence activities, sources and methods whose release would confirm their use and risk circumvention by targets of ongoing foreign counterintelligence and espionage investigations; and information relating to foreign relations or activities."  Def.'s Mem. at 6.  Executive Order 13,526 "governs the classification and protection of information that affects the national security," Hardy Decl. 2 ¶ 40, and specifically authorizes agencies to classify this category of information, Exec. Order No. 13,526, § 1.4(c).  The Section Chief of the Record/Information Dissemination Section of the FBI, an original classification authority, Hardy Decl. 2 ¶ 42, "personally and independently examined the information withheld from [the] plaintiff pursuant to FOIA Exemption [(b)(1)] . . . [and] determined that the classified information continues to warrant classification at the 'Secret' level . . . pursuant to [Executive Order 13526]," id. ¶ 43.  This is "because its release would reveal actual intelligence activities and methods used by the FBI against specific targets of foreign counterintelligence investigations or operations; identify a target of a foreign counterintelligence investigation; or disclose the intelligence gathering capabilities of the activities or methods directed at specific targets."  Id. ¶ 45.

The FBI further maintains that disclosure of "specific information describing . . . intelligence activities or methods" for which this exemption was asserted "could reasonably be

expected to cause serious damage to the national security," because: "(1) disclosure would allow hostile entities to discover the current intelligence gathering methods used by the FBI; (2) disclosure would reveal current specific targets of the FBI's national security investigations; and (3) disclosure would reveal the determination of the criteria used and priorities assigned to current intelligence or counterintelligence investigations." Id. ¶ 46.  Thus, the FBI asserts that "hostile entities could develop countermeasures which would . . . severely disrupt the FBI's intelligence gathering capabilities . . . [and] efforts to detect and apprehend violators of the United States' national security and criminal laws." Id.  With respect to "intelligence activity information gathered or compiled by the FBI on a specific individual or organizations of national security interest," the FBI maintains that disclosure could reasonably be expect to cause serious damage to the national security because it would : "(a) reveal the actual intelligence activity or method utilized by the FBI against a specific target; (b) disclose the intelligence-gathering capabilities of the method; and (c) provide an assessment of the intelligence source penetration of a specific target during a specific period of time." Id. ¶ 47.

Affording "substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record," as the Court must do upon consideration of a motion for summary judgment, Ctr. for Nat'l Sec. Studies, 331 F.3d at 927, the FBI has offered sufficient factual detail for the Court to conclude that the category of information withheld under Exemption (b)(1) may be classified according to Executive Order 13,526, and that the specific documents in question were properly classified pursuant to that Order.  The plaintiff does not challenge the FBI's assertion of this Exemption with respect to his first FOIA request.  See Pl.'s Opp'n at 13 (the plaintiff "elects not to challenge many aspects of [the] FBI's argument").  Accordingly, the Court concludes that the FBI properly withheld this information pursuant to

Exemption (b)(1).  See, e.g., Nat'l Sec. Counselors v. CIA, 960 F. Supp. 2d 101, 166 (D.D.C.

2013) ("Although many details of these two documents remain unknown, the [government]'s

declaration plausibly establishes that the withheld information relates to sensitive operations

within the Intelligence Community, the substance of which is properly classified in the interest

of national security. That is sufficient to grant summary judgment."); DiBacco v. U.S. Dep't of

the Army, 983 F. Supp. 2d 44, 61 (D.D.C. 2013) ("[The government]'s unrebutted declaration

establishes with a reasonable level of specificity that the information at issue was properly

classified . . . and thus was properly withheld under FOIA exemption (b)(1). Therefore, the

agency is entitled to summary judgment on this issue.").[7]

### 2.  Exemption (b)(7)

Pursuant to Exemption (b)(7), and as relevant to the defendants' pending motion for

summary judgment, an agency may withhold:

> [R]ecords or information compiled for law enforcement purposes, but only to the
> extent that the production of such law enforcement records or information (A) could
> reasonably be expected to interfere with enforcement proceedings, . . . (C) could
> reasonably be expected to constitute an unwarranted invasion of personal privacy,
> (D) could reasonably be expected to disclose the identity of a confidential source,
> including a State, local, or foreign agency or authority or any private institution
> which furnished information on a confidential basis, and, in the case of a record or
> information compiled by criminal law enforcement authority in the course of a
> criminal investigation or by an agency conducting a lawful national security
> intelligence investigation, information furnished by a confidential source, [or] (E)
> would disclose techniques and procedures for law enforcement investigations or
> prosecutions, or would disclose guidelines for law enforcement investigations or
> prosecutions if such disclosure could reasonably be expected to risk circumvention
> of the law . . .

5 U.S.C. § 552(b)(7).

---

[7] The FBI also asserts that it withheld this information pursuant to Exemption (b)(3).  The Court having concluded
that the FBI properly withheld this information pursuant to Exemption (b)(1), it need not also consider the
applicability of Exemption (b)(3).  See Larson v. Dep't of State, 565 F.3d 857, 862-63 (D.C. Cir. 2009) ("[A]gencies
may invoke the exemptions independently and courts may uphold agency action under one exemption without
considering the applicability of the other." (citation omitted)).

"To show that . . . documents were compiled for law enforcement purposes, the [agency] need only establish a rational nexus between the investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law."  Blackwell v. FBI, 646 F.3d 37, 40 (D.C. Cir. 2011) (internal quotations and citations omitted).  The FBI explains that it is

> the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security, and further the foreign intelligence objectives of the United States.  Under this investigative authority, the responsive records herein were compiled for the purposes of investigating and gathering intelligence information, and apprehending and prosecuting subjects who have committed acts of terrorism against the United States, and such records relate to the enforcement of federal laws and such activity is within the law enforcement duty of the FBI.  The records resulted from the FBI's investigation into acts of terrorism against the United States committed by Zacarias Moussaoui and Abderraouf Jdey.  Accordingly, the responsive records were generated pursuant to the law enforcement duties of the FBI as articulated above.  In this case, records pertaining to the arrest and conviction of Zacarias Moussaoui for conspiring to commit acts of terrorism and for conspiring to use weapons of mass destruction against the United States in connection with the September 11th attacks [and] . . . the investigation into Abderraouf Jdey and his connection with terrorist threats against the United States also falls within the law enforcement duties of the FBI.

Hardy Decl. 2 ¶ 36.  Based upon these representations, the FBI has demonstrated a "rational nexus" that satisfies Exemption (b)(7)'s threshold requirement.  See, e.g., Blackwell, 646 F.3d at 40; Roberts v. FBI, 845 F. Supp. 2d 96, 103 (D.D.C. 2012) ("It is apparent from the nature of plaintiff's FOIA request that the information he seeks was compiled for law enforcement purposes . . . .  Thus, the [agency] meets its initial burden of establishing that the records at issue are law enforcement records for purposes of Exemption 7.").  Accordingly, the Court now turns to the merits of the FBI's assertions of this Exemption based on sub-paragraphs (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

### a. Exemption (b)(7)(A)

Exemption (b)(7)(A) protects from disclosure "records or information compiled for law enforcement purposes" if disclosure "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).  The "purpose of [the] exemption is to prevent [harm] to the Government's case in court by not allowing litigants early or greater access to agency investigatory files than they would otherwise have." Mapother v. U.S. Dep't of Justice, 3 F.3d 1533, 1540 (D.C. Cir. 1993) (quoting NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 224-25 (1978)).  To justify withholding information pursuant to Exemption (b)(7)(A), the agency must demonstrate that "disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated." Mapother, 3 F.3d at 1540.  Exemption (b)(7)(A) "does not authorize automatic or wholesale withholding of records or information simply because the material is related to an enforcement proceeding." North v. Walsh, 881 F.2d 1088, 1097 (D.C. Cir. 1989).  The defendant "must show, by more than [a] conclusory statement, how the particular kinds of investigatory records requested would interfere with a pending enforcement proceeding." Campbell v. HHS, 682 F.2d 256, 259 (D.C. Cir. 1982).  However, "the government need not justify its withholdings document-by-document; it may instead do so category-of-document by category-of-document." Crooker v. Bureau of Alcohol, Tobacco & Firearms, 789 F.2d 64, 67 (D.C. Cir. 1986).  Accordingly, an agency must define its categories functionally, determine, document-by-document, the category into which each document falls, and explain "how the release of each category would interfere with enforcement proceedings." Bevis v. U.S. Dep't of State, 801 F.2d 1386, 1389-90 (D.C. Cir. 1986).

The FBI asserted this exemption for portions of one document responsive to the plaintiff's first FOIA request.  See Hardy Decl. 2 ¶ 68 n.29.  The FBI represents that:

this information is intertwined with other ongoing investigations of known and suspected terrorists. The FBI has determined that disclosure of the information, in the midst of these active and ongoing investigations, is reasonably expected to interfere with those investigations as well as any resulting prosecutions. As such, the release of this information would interfere with pending and prospective enforcement proceedings, including investigations and prosecutions.

Id. ¶ 68.

Similarly, with respect to the plaintiff's second FOIA request for "FBI's entire file on al Qaeda operative Abderraouf Jdey," Am. Compl. ¶ 17, the FBI released "public source material," Hardy Decl. 2 ¶ 78, but otherwise "asserted [Exemption] (b)(7)(A) to categorically deny" the request, Hardy Decl. 3 ¶ 22. The FBI represents that this is because these records "relate to pending investigations, and are intertwined with other ongoing investigations of known and suspected terrorists." Hardy Decl. 2 ¶ 78. Thus, it posits that "disclosure of any responsive records, in the midst of these active and ongoing investigations, is reasonably expected to interfere with those investigations as well as any resulting prosecutions." Id.

In its affidavit, the FBI describes three general categories under which it sorted the documents responsive to the plaintiff's requests pursuant to Exemption (b)(7)(A): "Evidentiary/Investigative Materials, Administrative Materials, and Public Source/Non-Investigative Harm Materials." Id. ¶ 82. The first "category includes copies of records or evidence, analyses of evidence, and derivative communications discussing or incorporating evidence." Id. ¶ 84. This may include: (1) confidential source statements that could cause harm if released because "the sources that have chosen to cooperate with law enforcement could be subjected to retaliation, intimidation, or physical or mental harm, or even death," and "would have a chilling effect on these investigations and any future prosecutions," id. ¶ 85; (2) "information exchanged between the FBI and its law enforcement partners whether local, state, or federal," the release of which "would identify the investigative interest of particular

individuals[,] reveal the scope and focus of the investigation[,] identify and tip off individuals who are of interest to law enforcement[,] and provide suspects or targets the opportunity to destroy evidence and/or alter their behavior to avoid detection," id. ¶ 86; (3) documents containing information shared between the FBI and foreign governments, the release of which "would not only disclose the evidence, investigative information, and criminal intelligence that was developed and shared, but it would damage the progress made in this investigation as well as harm the efforts made in other terrorist-related investigations," "would identify the FBI's and the foreign government agencies' investigative interest in particular individuals[,] reveal the scope and focus of the investigation[,] identify and tip off individuals of interest to law enforcement[,] and provide suspects or targets the opportunity to destroy evidence and/or later their behavior to avoid detection," and "would disclose the identity of foreign government agencies that cooperate with the FBI and . . . would ultimately have a chilling effect on the FBI's working relationships with foreign government agencies," id. ¶ 87; and (4) information concerning physical or documentary evidence, the release of which "would undermine efforts made in this investigation, possibly interfere with other terrorist-related investigations, and disrupt future prosecutions," "would reveal the scope and focus of this investigation as well as the identity of subjects who are of investigative interest," "could lead to the identification of confidential sources," and "could result in the possible intimidation of or harm to witnesses and sources who have assisted the FBI," id. ¶ 88.

The second category includes "items such as case captions, serial numbers, identities of FBI field offices, dates of investigations, and detailed instructions designed to ensure that investigative procedures are conducted within the appropriate FBI and DOJ guidelines." Id. ¶ 89.  This may include: (1) reporting communications, the release of which "would reveal the

nature and scope of the ongoing investigation by revealing . . . the investigative steps taken to obtain witness and source interviews[,] techniques and investigative methods used to compile and/or solicit information from various sources[,] and any potential or perceived challenges in the investigations," id. ¶ 90; (2) miscellaneous administrative documents such as storage envelopes, transmittal forms, and standardized forms, the release of which "could undermine this pending and ongoing investigations as well as pending and prospective prosecutions" because "the manner in which they have been used and organized in the files also reveals information of investigative value," id. ¶ 91; and (3) administrative instructions, the release of which "would disclose specific investigative procedures employed in this investigation" and "would permit subjects or individuals of investigative interest to anticipate law enforcement actions and to alter, destroy, or fabricate evidence," id. ¶ 93.

The last category includes "public source material that did not pose an investigative harm." Id. ¶ 95. The FBI states that it could release this information to the plaintiff "without harm to the ongoing investigation, as the information is already known to the public and/or is not reasonably expected to interfere with pending criminal law enforcement proceedings or prosecutions." Id. The defendant released to the plaintiff all records included in this category. Id. ¶ 78, n.32.

Based upon the representations set forth in its affidavits, the Court concludes that that FBI has met its burden in asserting Exemption (b)(7)(A) for the information withheld from the documents responsive to the plaintiff's FOIA requests. See, e.g., Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice, 746 F.3d 1082, 1098 (D.C. Cir. 2014) ("[I]f it wishes to adopt the generic approach, [an agency] . . . must define its categories functionally[,] . . . conduct a document-by-document-review in order to assign documents to the proper category[,] . . . and

explain to the court how the release of each category would interfere with enforcement proceedings." (quoting <u>Bevis</u>, 801 F.2d at 1389-90)).

The plaintiff does not challenge the FBI's assertion of this exemption with respect to his first FOIA request, <u>see</u> Pl.'s Opp'n at 13-14, but does challenge the FBI's categorical assertion of the Exemption for his second request, <u>id.</u> at 21-22.  His sole argument stems from the premise that "if Jdey was detained, <u>he already knows what happened</u>" and thus "[r]elease of information about his detention cannot reasonably be expected to assist him in avoiding detection, since he presumably knows what he said and what the agents did."  <u>Id.</u> at 22.  This argument is without merit because it fails to take into consideration any of the reasons for which the FBI states it is withholding this information.  Specifically, the FBI notes that:

> the investigation[s] into the terrorist threats committed by Abderraouf Jdey do not stand in isolation, but rather, stretch like tentacles connecting to other ongoing and pending national security investigations . . . .  The FBI is relying on Exemption 7 to not only prevent interference with the ongoing investigation of Abderraouf Jdey, but to avoid disruption to the many other pending and related national security investigations and prosecutions that are interconnected to Jdey.

Hardy Decl. 2 ¶ 81.  The FBI further clarified this point in its Reply to the plaintiff's opposition to its summary judgment motion, noting that Jdey:

> traveled to Afghanistan in 1999 where he received combat training from the Taliban government.  He has direct ties with known and suspected terrorists, who are also the subject of various pending FBI investigations and prosecutions.  Jdey is suspected of plotting terrorist attacks against the United States.  Jdey has direct connections with high-ranking terrorists.  He has consorted with terrorists over the past decade and is wanted for questioning in connection with terrorist threats made against the United States.

Hardy Decl. 3 ¶ 22.  Any notion that disclosure of this information would impact only the investigation of Jdey is dispelled by these representations.  Jdey's familiarity with the information noted in his own file is of no consequence, as Exemption (b)(7)(A) only requires an agency to demonstrate that disclosure "could reasonably be expected to interfere with . . .

enforcement proceedings that are . . . pending or reasonably anticipated," Mapother, 3 F.3d at 1540 (emphasis omitted), and the FBI's representations adequately explain the impact that disclosure may have on enforcement proceedings concerning known or suspected terrorists other than Jdey.  Thus, the Court sees no reason to disturb the conclusion above that the defendant properly asserted Exemption (b)(7)(A) with respect to the plaintiff's second FOIA request.[8]

### b.  Exemption (b)(7)(C):  Unwarranted Invasion of Personal Privacy

Exemption (b)(7)(C) protects from disclosure information in law enforcement records that "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  "In deciding whether the release of particular information constitutes an unwarranted invasion of privacy under Exemption [(b)(7)(C)], [the Court] must balance the public interest in disclosure against the [privacy] interest Congress intended the Exemption to protect."  ACLU v. U.S. Dep't of Justice, 655 F.3d 1, 6 (D.C. Cir. 2011) (internal quotations and citation omitted). The privacy interest at stake belongs to the individual, not the government agency, see U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 763-65 (1989), and "individuals have a strong interest in [avoiding unwarranted association] with alleged criminal activity," Stern v. FBI, 737 F.2d 84, 91-92 (D.C. Cir. 1984).  When balancing the private interest against the public interest in disclosure, "the only public interest relevant for purposes of Exemption [(b)(7)(C)] is one that focuses on 'the citizens' right to be informed about what their government is up to.'"  Davis v. U.S. Dep't of Justice, 968 F.2d 1276, 1282 (D.C. Cir. 1992) (quoting Reporters Comm., 489 U.S. at 773).  "As a general rule, third-

---

[8] The FBI also asserts that it withheld portions of the records responsive to the plaintiff's second FOIA request pursuant to Exemptions (b)(1), (b)(3), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), (b)(7)(E) and (b)(7)(F).  The Court having concluded that the FBI properly withheld all non-public records responsive to the second request pursuant to Exemption (b)(7)(A), it need not also consider the applicability of these other Exemptions.  See Larson, 565 F.3d at 862-63 ("[A]gencies may invoke the exemptions independently and courts may uphold agency action under one exemption without considering the applicability of the other." (citation omitted)).

party identifying information contained in [law enforcement] records is 'categorically exempt' from disclosure." Lazaridis v. U.S. Dep't of State, 934 F. Supp. 2d 21, 38 (D.D.C. 2013) (quoting Nation Magazine, Wash. Bureau v. U.S. Customs Serv., 71 F.3d 885, 896 (D.C. Cir. 1995)).

Pursuant to Exemption (b)(7)(C), the FBI withheld "the names of FBI Special Agents ("SAs") who are responsible for conducting, supervising, and/or maintaining the investigative activities in this pending investigation and related investigation," Hardy Decl. 2 ¶ 55, and "[t]he names and identifying information of FBI support employees," id. ¶ 56.  The FBI claims that if this information were released, "individuals may seek revenge on the agents and other federal employees involved in a particular investigation," the disclosure "could trigger hostility toward a particular agent," and employees "could become targets of harassing inquiries for unauthorized access to FBI investigations."  Id. ¶¶ 55-56.  "The FBI could not identify any discernible public interest" in the disclosure of this information, because it "could not determine how the disclosure . . . would shed any light on the operations and activities of the FBI."  Id. ¶ 57.  Accordingly, "the FBI determined that the privacy interests of the [Special Agents] and support personnel outweighed any public interest in disclosure, and that disclosure . . . would constitute . . . [an] unwarranted invasion of person[al] privacy."  Id.

Similarly, the FBI withheld "the names and/or identifying information of non-FBI federal, state, and local government personnel."  Id. ¶ 63.  The FBI asserts that "[d]isclosure of their identities and identifying information could subject them to unauthorized inquiries and harassment."  In contrast, "[t]he FBI could identify no discernible public interest in the disclosure of this information because the disclosure . . . will not shed light on the operations and

activities of the FBI." Id. ¶ 64. "Accordingly, the FBI determined that the disclosure of this information would constitute . . . [an] unwarranted invasion of personal privacy." Id.

Pursuant to this exemption, the FBI also withheld the names and identifying information of third parties "who were interviewed during the course of the FBI's investigation." Id. ¶ 58. The FBI represents that individuals who provide information may fear "that their identity will possibly be exposed and consequently they could be harassed, intimidated, or threatened with legal action, economic reprisal, possible physical harm, or even death." Id. ¶ 59. Thus, "persons interviewed by the FBI must be assured that their names and personal identifying information will be held in the strictest confidence." Id. "The FBI could identify no discernible public interest in the disclosure of this information, as disclosure . . . would not shed light on the operations and activities of the FBI." Id. ¶ 60. Accordingly, it "concluded that the disclosure . . . would constitute . . . [an] unwarranted invasion of their personal privacy." Id.

The Exemption was also asserted for the names and identifying information of third parties "merely mentioned in the responsive records." Id. ¶ 61. The FBI asserts that "[d]isclosure of their identities could subject them to possible harassment or criticism, and focus derogatory inferences and suspicion on them." Id. "The FBI could not identify any discernible public interest," because it "could not determine how the disclosure . . . would shed any light on the operations and activities of the FBI." Id. ¶ 62. Accordingly, it "determined that these individual privacy interests substantially outweighed any public interest in disclosure, and that disclosure . . . would constitute . . . [an] unwarranted invasion of privacy." Id.

Lastly, the FBI asserted the Exemption "to protect the names and/or identifying information of third party individuals who are of investigative interest to the FBI and/or other law enforcement agencies." Id. ¶ 65. According to the FBI, disclosure of these individuals

"could subject them to harassment or embarrassment, as well as undue public attention" because "[b]eing linked with any law enforcement investigation carries a strong negative connotation and a stigma."  Id.  The FBI also determined that "this information would not enlighten the public on how the FBI conducts its internal operations and investigations."  Id.  Accordingly, it "concluded that the disclosure of this information would constitute . . . [an] unwarranted invasion of their personal privacy."  Id.

Based upon these representations, the FBI has demonstrated that the disclosure of each of these categories of information could reasonably be expected to constitute an unwarranted invasion of personal privacy.  See, e.g., Banks v. U.S. Dep't of Justice, 813 F. Supp. 2d 132, 144 (D.D.C. 2011) ("Public identification of [law enforcement personnel] could conceivably subject them to harassment and annoyance in the conduct of their official duties and in their private lives" (internal quotation omitted)); Schoenman v. FBI, 763 F. Supp. 2d 173, 198 (D.D.C.2011) (finding appropriate the withholding of information about FBI agents and support personnel, non-FBI federal government personnel, local and foreign law enforcement personnel, third parties of investigative interest, third parties who provided information to the FBI, and third parties incidentally mentioned in FBI records); Voinche v. FBI, 412 F. Supp. 2d 60, 67-68 (D.D.C. 2006) ("the privacy interests of the individuals whose information was withheld by the FBI clearly outweigh the narrowly construed public interest in disclosure.").  The plaintiff does not challenge the FBI's assertion of Exemption (b)(7)(C) with respect to his first FOIA request.

<u>See</u> Pl.'s Opp'n at 13-14.  Accordingly, the Court concludes that the FBI properly asserted

Exemption (b)(7)(C) with respect to the plaintiff's first[9] FOIA request.[10]

### c.  Exemption (b)(7)(D)

Exemption (b)(7)(D) protects from disclosure information in law enforcement records

that "could reasonably be expected to disclose the identity of a confidential source . . . [and]

information furnished by a confidential source."  5 U.S.C. § 552(b)(7)(D).  "A source is

confidential within the meaning of [Exemption (b)(7)(D)] if the source provided information

under an express assurance of confidentiality or in circumstances from which such an assurance

could be reasonably inferred."  <u>Williams v. FBI</u>, 69 F.3d 1155, 1159 (D.C. Cir. 1995) (citation

omitted).

Pursuant to Exemption (b)(7)(D) the FBI withheld "the names, identifying information,

and information provided by third parties under circumstances in which confidentiality can be

inferred."  Hardy Decl. 2 ¶ 73.  The FBI represents that "[t]hese individuals provided valuable

and detailed information on persons who are the subject of national security investigations."  <u>Id.</u>

The FBI asserts that "[t]he disclosure of the identities and/or the information provided by the

individuals could have disastrous consequences [such that] the disclosure of their identities could

subject them to reprisals and will have a chilling effect on future witness cooperation."  <u>Id.</u>; <u>see</u>

<u>also</u> Hardy Decl. 3 ¶ 19.  The FBI warns that "[t]errorists have committed violent acts and death

against innocent individuals; therefore it is reasonable to think terrorists would conduct such acts

---

[9] With respect to the plaintiff's second FOIA request, the Court concluded, <u>supra</u>, that the FBI properly asserted Exemption (b)(7)(A) for all responsive information it withheld.  Thus, the Court need not consider the applicability of Exemption (b)(7)(C) to the plaintiff's second FOIA request.

[10] The FBI also asserts that it withheld each of these categories of information pursuant to Exemption (b)(6).  The Court having concluded that the FBI properly withheld this information pursuant to Exemption (b)(7)(C), it need not also consider the applicability of Exemption (b)(6).  <u>See</u> <u>Larson</u>, 565 F.3d at 862-63 ("[A]gencies may invoke the exemptions independently and courts may uphold agency action under one exemption without considering the applicability of the other." (citation omitted)).

against individuals who have worked against them and provided information to the FBI."  Hardy

Decl. 3 ¶ 19.  The plaintiff challenges as conclusory the defendant's assertions, and characterizes

the affidavit as improperly suggesting that "every person [the FBI] interviews in a national

security investigation has an implied assurance of confidentiality."  Pl.'s Opp'n at 18.  The

plaintiff questions further whether these sources "provided information pursuant to an implied

assurance of confidentiality" when each are described by the defendant as "a reliable source."

Id.

   "When no express assurance of confidentiality exists, courts consider a number of factors

to determine whether the source nonetheless spoke with an understanding that the

communication would remain confidential," Roth, 642 F.3d at 1184 (internal quotation marks

and citation omitted), such as "[t]he nature of the crime . . . investigated and the source's relation

to it," U.S. Dep't of Justice v. Landano, 508 U.S. 165, 180 (1993).  There are "generic

circumstances in which an implied assurance of confidentiality fairly can be inferred," Landano,

508 U.S. at 179, and "whatever his 'relation to the crime,' an informant is at risk to the extent the

criminal enterprise he exposes is of a type inclined toward violent retaliation," Mays v. Drug

Enforcement Admin., 234 F.3d 1324, 1330 (D.C. Cir. 2000).  Given the defendant's

representations as to the violent nature of the terrorist organizations in question, and the

informants' "close proximity to and relationship with known terrorists," Hardy Decl 3 ¶ 19, the

Court concludes that the defendant may reasonably infer that this information was provided

under an implied assurance of confidentiality, cf. Fowlkes, __ F. Supp. 3d at __, 2014 WL

4536909, at *11 (concluding that it would be "reasonable to infer" that sources assisting an

investigation into a conspiracy to distribute cocaine and crack cocaine "would fear for their

safety" because "violence is inherent in the illicit trafficking of cocain[e] and crack cocain[e]").

Thus, the Court concludes that the defendant properly withheld this information pursuant to Exemption (b)(7)(D).[11]

### d.   Exemption (b)(7)(E): Investigative Techniques and Procedures

Exemption (b)(7)(E) protects from disclosure information in law enforcement records that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  "Exemption [(b)(7)(E)] sets a relatively low bar for the agency to justify withholding: [r]ather than requiring a highly specific burden of showing how the law will be circumvented, exemption [(b)(7)(E)] only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law."  Blackwell, 646 F.3d at 42 (alteration in original) (internal quotation marks omitted).

Pursuant to Exemption (b)(7)(E), the FBI withheld "information regarding the techniques and procedures utilized by the FBI in conducting national security investigations[,] including information that would reveal what types of techniques and procedures are routinely used in such investigations, and that are not publicly known."  Hardy Decl. 2 ¶ 76.  Specifically, "the FBI is protecting the use of a particular database in connection with the investigations at issue," Def.'s Reply at 12, and "[a]lthough the existence of the database may be known, the manner in which it has been used . . . involves techniques and procedures unknown to the general public," id. at 15.  The FBI asserts that "revealing what techniques and procedures are commonly used in national

---

[11] The plaintiff also argues that Exemption (b)(7)(D) "does not match the context" of the sixth page of the documents released by the FBI, and challenges the FBI's redaction of a portion of that page.  Pl.'s Opp'n at 18.  Following the filing of the plaintiff's opposition, the FBI conducted another review of this document and "concluded that the information withheld pursuant to Exemption [(b)(7)(D)] on [this page] can be released."  Def.'s Reply at 9, n.1.  The FBI provides a new version of this page without redactions pursuant to Exemption (b)(7)(D) as an attachment to its Reply to the plaintiff's opposition to its summary judgment motion, see Hardy Decl. 3, Ex. A. (Dillon-6), and therefore, the Court concludes that this argument by the plaintiff is moot.

security investigations . . . would enable the targets of these techniques to avoid detection or

develop countermeasures to circumvent the FBI's ability to effectively use these critical law

enforcement techniques in current and future investigations."  Hardy Decl. 2 ¶ 76.

The plaintiff argues that "Exemption (b)(7)(E) may only be used to withhold techniques

and procedures unknown to the public," and the information withheld pertains to "database

search results located though . . . databases" to which "local, state, and other federal agencies

have access."  Pl.'s Opp'n at 19.  Thus, the plaintiff questions "how many people can know

about something before it is considered known to the public?"  Id. at 20 (internal quotation

marks omitted).  But under Exemption (b)(7)(E), "even commonly known procedures may be

protected from disclosure if the disclosure could reduce or nullify their effectiveness."  Judicial

Watch, Inc. v. U.S. Dep't of Commerce, 337 F. Supp. 2d 146, 181 (D.D.C. 2004) (citation

omitted).  For example, another member of this Court has agreed with the FBI that "while the

public generally knows and understands that law enforcement utilizes the [National Crime

Information Center] databases[,] . . . the details of those queries—including how they are

executed, what search terms are used, what [ ] passwords and clearances are required, and who

has authorization to run such queries, are not known to the public."  Vazquez v. U.S. Dep't of

Justice, 887 F. Supp. 2d 114, 117 (D.D.C. 2012).  Here, the FBI asserts that "[r]evealing details

about the investigative techniques used by the FBI in gathering information on individuals of

investigative interest would enable those individuals to alter their behavior, determine what

information is known or used by the FBI and develop ways to avoid detection or develop

countermeasures to circumvent the law," Hardy Decl. 3 ¶ 21, and "[t]o describe the investigative

technique in further detail would highlight the very information the FBI seeks to protect pursuant

to this exemption," id. ¶ 20.  The fact that law enforcement officers outside of the FBI have

access to a particular database does not preclude the FBI from withholding information regarding the methods of its utilization of that database pursuant to this Exemption.  See, e.g., Vazquez, 887 F. Supp. 2d at 117.

The plaintiff also argues that the FBI "has stated conclusorily [sic] that any information gleaned from these databases is exempt, without explaining why the exact information withheld would allow wrongdoers to circumvent the law."  Pl.'s Opp'n at 21.  The plaintiff draws attention to "an unsettled area of FOIA law, namely, whether 'techniques and procedures' require a showing that 'disclosure could reasonably be expected to risk circumvention of the law.'"  Id. at 20.  Indeed, some members of this Court have held that "[t]he first clause of Exemption [(b)(7)(E)] affords 'categorical' protection for 'techniques and procedures' used in law enforcement investigations or prosecutions," while "Exemption [(b)(7)(E)]'s second clause separately protects 'guidelines for law enforcement investigations or prosecutions if [their] disclosure could reasonably be expected to risk circumvention of the law.'"  McRae v. U.S. Dep't of Justice, 869 F. Supp. 2d 151, 168 (D.D.C. 2012) (quoting Pub. Emps. for Envtl. Responsibility v. U.S. Section Int'l Boundary & Water Comm'n, 839 F. Supp. 2d 304, 327 (D.D.C. 2012).  Yet other members of this Court have indicated that "information pertaining to law enforcement techniques and procedures properly is withheld under Exemption [(b)(7)(E)] where disclosure reasonably could lead to circumvention of laws or regulations," suggesting that categorical protection of techniques and procedures is not appropriate.  See Holt v. U.S. Dep't of Justice, 734 F. Supp. 2d 28, 48 (D.D.C. 2010).  However, the Court need not address this discrepancy because the FBI has set forth sufficient factual detail demonstrating that the disclosure of the withheld information "could reasonably be expect to risk circumvention of the law."  Hardy Decl. 3 ¶ 20.  As noted by the FBI, revealing the manner in which the FBI utilizes a

particular database to "develop[] leads [and] and gather[] information . . . would enable . . . individuals to alter their behavior, determine what information is known or used by the FBI and develop ways to avoid detection or develop countermeasures." Id. at ¶¶ 21-22.  The Court agrees and therefore concludes that the FBI properly withheld this information pursuant to Exemption (b)(7)(E).

## C. Segregability

Under the FOIA, "even if [the] agency establishes an exemption, it must nonetheless disclose all reasonably segregable, nonexempt portions of the requested record(s)." Roth, 642 F.3d at 1167.  "[I]t has long been the rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." Wilderness Soc'y v. U.S. Dep't of Interior, 344 F. Supp. 2d 1, 18 (D.D.C. 2004), (quoting Mead Data Cent., Inc. v. U.S. Dep't of Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977)).  The agency must provide "a detailed justification and not just conclusory statements to demonstrate that all reasonably segregable information has been released." Valfells v. CIA, 717 F. Supp. 2d 110, 120 (D.D.C.2010).  That being said, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" by the requester.  Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1117 (D.C. Cir. 2007).

In its affidavit, the FBI explains that "[f]or a majority of records . . . , segregability is not possible because they are exempt from disclosure [in their entirety] pursuant to Exemption 7(A)." Hardy Decl. 2 ¶ 199.  With respect to the remaining records, the FBI states that it "carefully reviewed the material withheld in part from the information related to Moussaoui and determined that no additional non-exempt information could be released." Def.'s Mem. at 41.

And of these records, "no pages were withheld in full on the basis of a FOIA exemption and the remaining responsive pages were released with all reasonably segregable, non-exempt information."  Hardy Decl. 2 ¶ 199.  Based upon these representations, the Court concludes that the FBI has satisfied its segregability obligation under the FOIA.  <u>See, e.g.</u>, DiBacco, 983 F. Supp. 2d at 65 (finding the agency's segregability requirement satisfied where it conducted a "document-by-document" review for segregable information and the plaintiffs failed to offer evidence rebutting the agency's representations in its declaration); <u>Blackwell v. FBI</u>, 680 F. Supp. 2d 79, 96 (D.D.C. 2010) (finding the agency's segregability requirement satisfied where the agency's declaration explained that "documents were processed to achieve maximum disclosure" and "further disclosure or attempt to describe information withheld would identify information protected by one of the FOIA exemptions").

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that the defendant submitted sufficient factual detail to find that it conducted reasonable and adequate searches of its records for documents responsive to the plaintiff's FOIA requests, released to the plaintiff all documents not otherwise subject to an applicable disclosure Exemption, and released all reasonably segregable information not otherwise exempt from disclosure.  Accordingly, the Court must grant the defendant's motion for summary judgment.

**SO ORDERED** this 1st day of May, 2015.[12]


REGGIE B. WALTON
United States District Judge

---

[12] An Order consistent with this Memorandum Opinion will be issued contemporaneously.